## LEITER v. THOMAS et al.

(Supreme Court, Appellate Division. First Department.   December 30, 1905.)

1. BROKERS—SALE OF STOCK HELD ON MARGINS—ACTION FOR WRONGFUL SALE —EVIDENCE.

   In an action against stockbrokers for damages for alleged unauthorized sales of stock held on margins, evidence considered, and *held*, that a verdict finding that there was no special agreement that plaintiff should maintain a certain margin on the stock was against the weight of the evidence.

2. SAME—SALE OF STOCK HELD ON MARGIN—AUTHORITY OF BROKER.

   Where stockbrokers purchased and held certain stocks for their principal, and during a panic in the stock market the margins became exhausted and they wrote to him and telephoned and telegraphed him at his New York and Chicago offices, and, receiving no reply on the next day, sold his stock, such sale was justified for their own and the principal's protection.

Appeal from Trial Term.

Action by Joseph Leiter against Edward R. Thomas and others. From a judgment for plaintiff, and from an order denying their motion for a new trial, defendants appeal. Reversed.

Argued before O'BRIEN, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and HOUGHTON, JJ.

Richard A. Irving, for appellants.
Charles K. Carpenter, for respondent.

LAUGHLIN, J. This is an action by a customer against stockbrokers for damages for alleged unauthorized sales of stock. The defendants constituted a firm of stockbrokers, one of them being a member of the New York Stock Exchange and representing the firm on the floor of the exchange. Prior to the month of May, 1901, the plaintiff had speculated in stocks on margins through the defendants, and on that day they held for his account 500 shares of Southern Pacific stock. By his direction they purchased for his account on the 1st day of May, 1901, 1,000 shares of International Power Company stock, 700 at 85 and 300 at 84¾. On that day he sent them the check of Joseph H. Hoadley for $25,000 as margins which was credited to his account. On the 9th day of May, in the afternoon, the defendants sold 100 shares of the Power Company stock at 70 and the 500 shares of Southern Pacific at 43½, and mailed notice thereof to him at Chicago, which he testifies he did not receive until the 12th; and on the 10th in the morning between 10 and 11 they sold 400 shares more of the Power Company stock, 100 at 73 and 300 at 75, and likewise mailed notice thereof to him at Chicago, which, according to his testimony, he did not receive until the 13th. On the 13th the plaintiff wrote the defendants repudiating these sales as unauthorized.

This action was brought to recover the damages sustained by the plaintiff, and he has recovered the difference between the price at which the stock was sold, which he has received through a settlement of the account, and the highest market price within a reasonable time after the sale. The action was defended upon two grounds: First, that the stock was purchased under a special agreement by which

the plaintiff was to keep on deposit with the defendants at all times a margin of $25,000, and that in the event that the market price depreciated and the plaintiff failed to keep such margin unimpaired they were to be at liberty to sell the stock "without other notice than notice that such margin had become reduced," and that they gave the plaintiff every notice to which he was entitled by virtue of the special agreement or by custom. The principal question of fact litigated upon the trial was whether there was a special agreement as pleaded by the defendants, and they contend that the verdict of the jury adverse to them on this issue is against the weight of the evidence.

The plaintiff testified that on the morning of May 1st he called up defendants' office on the telephone, and had a conversation with the defendant O. F. Thomas in which he inquired the quotations on International Power, and, on being informed, gave the defendants an order for the purchase of 1,000 shares; that nothing was said about margins, but that on prior stock speculations through the defendants he customarily kept a margin of 10 per cent., and, realizing that money could not readily be raised on this stock, he voluntarily sent the margin of $25,000; that at a subsequent conversation he informed one of the defendants that if they needed any more margin on his account to send word or telephone to 253 Broadway, which was his New York office, or to his Chicago address, which they had, and "that they could get it at 253 Broadway." And he so testified on a former trial of the case, but later, on the last trial, he says he expected that they would call him up if here, or wire him if in Chicago, and in answer to a leading question on redirect examination he testified that his statement to them was that they were to call him up at the New York office or wire him at Chicago, and admits that he never so testified before.

The defendant O. F. Thomas testified: That he made the agreement with the plaintiff. That he repeatedly had conversations with the plaintiff concerning the stock in which he referred to it as balloon stock, and that several days before the 1st day of May he asked the plaintiff if that (referring to the day on which he was speaking) was a good day "to get aboard" on International Power. That International Power at this time fluctuated from 10 to 15 points a day some days, and then remained stationary. That the evening before the stock was purchased he met the plaintiff at the Waldorf, and the latter said to him:

" 'I wish you would buy for me a thousand shares of that Power tomorrow.' I said: 'Mr. Leiter, you know we don't want to carry any such stock as that in our office. We never do.' He says: 'I think, when I ask you, that you should buy any stock that I do ask you to buy.' I told him I could not buy it in the ordinary way, but I would—if he wanted me to do him a favor, and buy the stock—I would do it under certain conditions. He asked me what my conditions were, and I told him he was to keep twenty-five points on the stock at all times, regardless of his customary or ordinary margin on any other stock that he might be carrying. Q. When you regardless—it went into the general account? A. Yes; he only had one account. But there was always to be twenty-five points, or $25,000, as against his International Power, in addition to any margin that he had on any other stocks that he was carrying. I said that to him. I also said to him at that interview that we were unwilling to carry the stock in the ordinary way, and we must be permitted—if any

time that margin, those twenty-five points, were impaired—to sell the stock without notice to him. In reply to that he said: 'Buy me the stock.' He says: 'You know all about this stock, don't you?. You know how we control it, and it is going up. You don't take any chances in buying this stock. It never can go down.' He told me that Hoadley and Judson and himself knew where all the stock was, and knew just what they could do with it. A long while before we had had some dealings with Power in our office: We had stopped operating with it or dealing in it. This happened on the evening of the 30th of April. I have not finished the conversation. He said, 'You know that you can have all the money you are of a mind to send for to 253 Broadway.' which I knew, of course, was the office of the International Power Company. We had a Chicago address already in his account—on his account. The account is always headed with an address. * * * The following day, the 1st of May, in the morning, I came out of the elevator, and as I was passing the office going down town I met Mr. Leiter; said good morning to him. He said, Don't forget to buy me that thousand shares of stock,' and I said, 'Don't forget to send the money,' and that was about all that was said, and I went on down to the office. He said, 'The check will come,' or something of that kind, jokingly. That is all the conversation on that morning. Shortly after I arrived at my office, I think shortly after 10 o'clock, he called me up on the telephone and asked me if I had bought the Power, and I said, 'Have you sent the check?' He said, 'The check is on the way.' I said, 'All right; then I will buy the Power.' The check arrived, and we bought the Power."

That shortly after the purchase of the stock the plaintiff said to him, in the presence of the defendant Post, evidently with a view to assuring them that they had taken no risk in buying the stock:

"You know all about the stock. You know that we can put it where we want to, and it is going up, and there is no danger in buying this stock."

That they had the plaintiff's New York and Chicago addresses on their books.

The defendant Post testified concerning the conversation between the plaintiff and defendant O. F. Thomas and himself as follows:

"My recollection of that conversation is that I was summoned from the New York Stock Exchange to come over to the office, that Mr. Leiter was there, and Mr. O. F. Thomas wished to see me. Mr. Leiter and Mr. O. F. Thomas were together in his office. I went and Mr. Thomas said: 'I have sent for you to explain an agreement that I have just made with Mr. Leiter by which I am now carrying for him 1,000 shares of the International Power Company's stock. I have arranged with Mr. Leiter that he shall keep $25,000 margin on this stock, good against any quotations on the New York Stock Exchange—against any prices. If this $25,000 is impaired, I have the right to sell the stock out at the market.' I said: 'Mr. O. F.'—which was the name which we called Mr. Thomas—'I think you are making a very foolish trade, because I feel that as this stock is entirely a manipulated one that Hoadley and Leiter will do you yet.' At which Mr. Leiter laughed, and Mr. Leiter then said: 'Mr. O. F. is running no danger, as this pool is going to put the stock up, away up above par, probably to 200.' I said: 'Very well, then, if that is the understanding, as Mr. O. F. has told me, I suppose that I may say that I am satisfied.' And Mr. Leiter said: 'Those are the terms under which I have induced Mr. Thomas to buy this stock.' This was practically all that was said at the conversation."

The plaintiff adhered to his original testimony concerning the agreement, and denied that it was agreed that his stock might be sold without notice, if the $25,000 margin should become impaired, or that he agreed to keep $25,000 margin or that he represented that the stock would go up to 200, but he did not deny having stated all else that the defendants attributed to him concerning the pool.

Plaintiff resided in Chicago, and had an office in that city where he transacted business when there, and he was a director of the International Power Company, and had an office with it, at No. 253 Broadway, where he transacted business when in New York. He operated in stocks to quite an extent, and in addition to this Power and Southern Pacific stock, he was carrying on margins 7,000 or 8,000 shares of other stock at the same time. It appears that between the 1st and 9th days of May he purchased machinery for the Rock Island Locomotive Works at his office in New York, but what other business, if any, besides speculating in stock he carried on there does not appear. The entire capital stock of the International Power Company consisted of 70,000 shares of the par value of $100 each. The plaintiff was familiar with Wall street speculations, and particularly in this stock. He and said Hoadley, who was president of the International Power Company, and one Jordan were in a pool concerning the stock of this company, by which its price could be inflated or depressed, and he so informed the defendants. This pool continued until December of the next year. It does not definitely appear how much of the stock they controlled, but the plaintiff testified that as his share of the pool he controlled 6,500 shares; that Hoadley was a large owner, but that Jordan had only a small interest; that their operations between May 1st and 10th involved about 5,000 shares as he recollected it, but that it might have involved 20,000 shares. He informed the defendants they were running no risk in carrying this stock, as the pool was back of it, and it was going up. It appears that a number of thousand shares of stock were bought and sold for the joint account of those interested in the pool immediately succeeding May 9th and 10th. Hoadley managed the pool when the plaintiff was in Chicago. The pool funds were used to settle the plaintiff's account with the defendants, and the 500 remaining shares of Power stock received from the defendants were credited to him on the pool account, and he was charged with the disbursements made. The court understood and so stated, and the fact was assumed on the trial that the "buying and selling of this stock on the 1st of May" was "all part of the pool transactions."

Plaintiff made frequent trips between New York and Chicago, and he says the defendants understood that this was his custom. Plaintiff testified that between the 1st and 8th days of May he met the defendant O. F. Thomas a number of times, and informed him that he was going West shortly, but did not inform him the precise time for that had not been determined upon, but this is controverted. He also testified that on the 8th day of May he was in his New York office until 1 o'clock p. m., and left at 5:30 on the Lake Shore Limited for Chicago, arriving there at 4:30 p. m., central standard time on the 9th; that although he had not watched the market, owing to the fact that he considered his stocks well margined, yet he knew before leaving New York that times were "getting pretty troublesome down in Wall Street in stocks"; that at noon of the 9th he read of the panic in the Toledo papers and expected that all stocks would be affected; than on arriving in Chicago he went immediately to his office, reaching there about 4:45 and remaining until 6:15 or 6:30 p. m.; that he

received a number of telegrams from brokers calling for further margins on Power and other stocks, and mailed checks aggregating $40,000 and had at his command $125,000 more; that he received no communication from the defendants and sent none to them; that he did not look at the stock quotations that night until after leaving his office and going to his home. One of the defendants testified that on the evening of the 8th of May they wrote a letter to the plaintiff in duplicate, one addressed to his New York office, and the other to his Chicago office, stating that the market that day had sustained one of the severest breaks in years, and calling his attention to the fact that his balance was just sufficient to margin the Power stock "as agreed upon," and that he also had 500 shares of Southern Pacific, which would thus be without margin, and asking him to call up defendant O. F. Thomas the following morning as he wished to speak to him regarding the Southern Pacific Stock. The plaintiff did not return to New York until about the 25th of May. He produced upon the trial the letter sent to the New York address, but did not say when he received it. He, however, testified that he received no communication from the defendants until the 12th of May, and that he did not receive the letter sent to the Chicago address. Shortly after the opening of the Stock Exchange on the 9th, the defendant Edward R. Thomas called up the plaintiff's New York office and inquired for him, and, on being informed that he was not there, asked to speak with his representative, whereupon a gentleman came to the telephone, and Mr. Thomas informed him that the plaintiff had not maintained his stock margin as agreed, and had directed that that office be called up when further margins were needed, and stated that unless the margins were forthcoming the defendants would sell the stock; and immediately thereafter Thomas telegraphed the plaintiff at his Chicago address as follows:

"Cannot borrow on Power. Everything here in very bad shape. Please wire $25,000 tomorrow."

It was conceded that this telegram was delivered to the Postal Telegraph Company for transmission in the ordinary course of business. The defendants undertook to show that the telegram was actually transmitted; but owing to the fact that the telegraph company destroys all messages and receipts given on the delivery of messages after six months, it turned out that there was no record of the forwarding of the message other than the bill rendered to the defendants by the telegraph company, which showed a message to Chicago on that day corresponding in the number of words with this message, but that was excluded on the objection of the plaintiff. The plaintiff, in his letter of May 13th repudiating the sale, stated that if the defendants wanted any more margins they could have had them by telegraphing him at Chicago. The defendants answered this letter on the 15th stating that their understanding of the arrangement was that he would carry 25 points on his Power stock and that as it had declined to 70, and there was no bid at any price at certain times on the day of the slump it was apparent that his arrangement was not carried out; that they had endeavored in every way to reach him both in New York and by telegraphing to Chicago, but received no reply and that on days "like last Thursday

it is necessary that we should be in communication with" our customers and notified where they are and that they thought the sale of the Southern Pacific stock was a good one, but had repurchased it that morning at the same price and sold it later on as directed by his telegram. To this letter the plaintiff replied on the 17th, saying: "I had no definite understanding with you that 25 points should be kept on International Power." That the margin of $25,000 was not exhausted when they sold the 500 shares. That "I was in Chicago on the 9th and 10th in my office. I received on those days many telegrams, but none from your concern. First notice I had of the sale was received last Monday by mail"—and he refused to recognize their right to sell any securities they were carrying for him while a margin remained on them and demanded that they deliver to him the 5,000 shares of Power stock which they sold. Figuring his stock at the minimum price on the 9th, which is the rule, his margin had been exhausted, and he was in their debt to the extent of $245.01. The defendants replied on the 20th, reiterating their position, and inclosing a copy of the letter of May 8th and of the telegram of May 9th, and complained of his having failed to tell them that he was going out of town and of the difficulty they encountered in ascertaining his whereabouts. The plaintiff further replied on the 3d of June, stating that he had not received the telegram, and that the letter addressed to him in New York was not received until after the sale, and repeated that he could not accept the sales as reported.

We are of opinion that, in so far as the jury found that there was no special agreement by which the plaintiff was to maintain the $25,000 margin on the Power stock, it is against the weight of the evidence. The plaintiff realized that this stock, on account of the difficulty of obtaining a loan upon it, would be of little use to brokers for their own or his protection in an emergency, and therefore he deposited the $25,000 as margin. It is evident that they did not regard the stock as safe securities, for it is undisputed that it was spoken of as balloon stock. It would seem that the plaintiff was very confident that the pool in which he was interested would control the stock and keep it on an upward tendency. He does not deny that he so informed the defendants. It is reasonable, then, from this standpoint, that feeling thus confident he would have been willing to give the defendants assurance that he would maintain the margin of $25,000. This he did not do. Moreover, we think the defendants discharged every duty they owed the plaintiff with respect to giving him notice. It must be borne in mind that this was one of the worst panics on Wall Street in many years. The defendants had a right to infer from plaintiff's statement to them, as related by himself on the first trial, and until the redirect examination on this trial, that they could get more margins when needed by sending or telephoning to his office in New York, or by wiring him at Chicago. Since he did not inform them of the time he was to leave the city, or by what train, so that he could have been reached en route if necessary, they had a right to assume that he would either be in his New York office or that Mr. Hoadley the manager of the pool, or someone would be there authorized to represent him, and advance further margins when called upon. Although he denies that

he purposely concealed his trip West, he admits that his understanding was that if they could not find him they would be obliged to wait a reasonable time before selling out his stock, and that he considered that their inability to find him on the train would give him 48 hours time to make good his margins before they would have a right to sell his stock. In this connection it is significant that, during all the correspondence, he insisted that he was at his office in Chicago and could have been reached there on the 9th, giving the impression that he was there all day, when in fact he did not arrive until late in the afternoon. They wrote him preliminarily on the 8th, they telephoned and wired him at Chicago on the 9th, and, receiving no reply, and he giving no attention to the account, notwithstanding the fact that he knew before leaving the city of the unsettled state of the stock market, they were justified in exercising their best judgment for their own protection and his in selling the stock.

It follows, therefore, that the judgment and order be reversed, and a new trial granted, with costs to appellants to abide the event. All concur.